UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES OF AMERICA,           :
                                    :    11-cr-93-1 (JSR)
        -v-                         :
                                    :    OPINION & ORDER
SIAVOSH HENAREH,                    :
                                    :
        Defendant.                  :
                                    :
-----------------------------------x

JED S. RAKOFF, U.S.D.J.

In 2010 and 2011, Siavosh Henareh brokered a 190-kilogram heroin transaction. The heroin shipments were intended for distribution in the U.S., and some of the proceeds were meant to finance the terrorist organization Hezbollah. Henareh expected to receive a six-figure commission. He was arrested in Romania, extradited, tried, and convicted of conspiracy to import heroin, in violation of 21 U.S.C. § 963.

At sentencing, the Court found that Henareh had "knowingly perjured himself in his testimony at trial on numerous occasions." Sent. Tr., ECF No. 146-2, at 12. The applicable United States Sentencing Guidelines range was 292 to 365 months. The Court remarked upon the gravity of Henareh's offense and found him to be generally unsympathetic. Id. at 33 (explaining that Henareh's presentation at sentencing was "filled with rationalizations and excuses and evasions for what the evidence proved overwhelmingly was his involvement in a huge narcotics scheme whose purpose,

moreover, was to provide support for terrorist activities"). Nevertheless, the Court found that a Guidelines sentence would be greater than necessary to comply with the purposes of criminal sentencing because (1) Henareh's role and involvement were "far from critical to the conspiracy," (2) he had no prior criminal record, (3) "all the evidence before the Court suggests that in every other aspect of his life, he has conducted himself as a good father, good family man, good citizen, good person," and (4) the Guidelines range called for a sentence "reserved for either kingpins or major recidivists or others whose life conduct bespeaks a degree of venality and evil that cannot truly on these facts be imputed to Mr. Henareh." Id. at 33-34. The Court imposed a sentence principally consisting of 210 months' imprisonment.

Henareh has now served about two-thirds of his sentence. On October 9, 2020, Henareh moved pro se for compassionate release. Emergency Motion for Reduction of Sentence, ECF No. 142. The Court appointed counsel under the Criminal Justice Act to supplement the motion, and it has been fully briefed. See Mem. in Support, ECF No. 144; Mem. in Opp., ECF No. 146; Reply Mem., ECF No. 147.

Henareh argues that two extraordinary and compelling reasons warrant his immediate release: first, the risk posed by COVID-19 given his age (63) and hypertension; and second, following his wife's stroke and his mother-in-law's serious illness, his family's need for his emotional and financial support.

LEGAL STANDARD

Henareh moves for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which provides:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction.

This remedy is sometimes colloquially referred to as "compassionate release," but, as the Second Circuit has explained, "compassionate release is a misnomer.  18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reduction.  A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . ."  United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020).  And this Court has previously done so.  United States v. Garcia, No. 11 CR. 989 (JSR), 2020 WL 7212962 (S.D.N.Y. Dec. 8, 2020); United States v. Rodriguez, No. 00 CR. 761-2 (JSR), 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020).

A Court evaluating a motion under this statute must ask four questions: (1) has the defendant complied with the administrative exhaustion requirement, (2) has the defendant shown extraordinary and compelling reasons warranting a sentence reduction, (3) are the 18 U.S.C. § 3553(a) sentencing factors consistent with a lesser

sentence than that previously imposed, and (4) is there a particular sentence reduction consistent with the § 3553(a) factors that is also warranted by extraordinary and compelling reasons?

The Government appears to believe that, in addition, Henareh must demonstrate that he falls within one of the compassionate release categories enumerated in Application Note 1 to United States Sentencing Guidelines § 1B1.13. The Application Note constitutes the Sentencing Commission's Policy Statement on this topic, and it recognizes three categories of extraordinary and compelling reasons -- relating to the defendant's medical condition, age, and family circumstances -- as well as such other extraordinary and compelling reasons "determined by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13 App. N. 1(d).

However, the Government misunderstands Henareh's burden. In Brooker, the Second Circuit rejected the Government's argument that "courts remain bound by [U.S.S.G. § 1B1.13 App. N. 1(d)], which makes the Bureau of Prisons the sole arbiter of whether most reasons qualify as extraordinary and compelling." 976 F.3d at 230. The court "h[e]ld that Application Note 1(D) does not apply to compassionate release motions brought directly to the court by a defendant under the First Step Act." Id. Instead, Congress has "empowered district courts evaluating motions for compassionate release to consider any extraordinary and compelling reason for

release that a defendant might raise." Id.  Congress has imposed

but one limitation: "[R]ehabilitation . . . alone shall not be

considered an extraordinary and compelling reason." Brooker, 976

F.3d at 237-238 (quoting 28 U.S.C. § 994(t)) (emphasis in Brooker).

ANALYSIS

I.   Administrative Exhaustion

Henareh has satisfied the administrative exhaustion

requirement because Henareh requested compassionate release from

the warden of his facility, who denied the request, and more than

a month has passed since Henareh's request.

II.  Extraordinary and Compelling Reasons

Henareh argues that two extraordinary and compelling reasons

warrant his immediate release: COVID-19 risk and his family's need

for his support in Romania.

Henareh undoubtedly faces a heightened risk for severe

COVID-19 because of his age and medical condition.  Henareh is 63.

According to the Centers for Disease Control and Prevention

("CDC"), adults age 50-64 who contract COVID-19 are 30 times more

likely to die than adults age 18-29.[1]  Henareh also has

---

[1]      CDC, Older Adults and COVID-19,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/older-adults.html (last accessed Jan. 8, 2021).

hypertension, which the CDC has said might place individuals at heightened risk for severe COVID-19.[2]

This Court has considered many motions for compassionate release based on the pandemic, but Henareh's motion is unusual in two respects.  First, Henareh has already apparently contracted and recovered from COVID-19.  Early in the pandemic, on March 31, 2020, Henareh complained of muscle aches, night sweats, a fever, and a cough.  He was given acetaminophen, placed in isolation, and monitored.  He received a COVID-19 test, which came back positive. After 17 days, the facility concluded that Henareh had recovered and returned him to the general population.  The Government argues that, having already contracted COVID-19, Henareh is less likely to contract it again.  Henareh does not really dispute this, though he argues that reinfection, although improbable, is possible, and that, also improbably, there is a chance that Henareh's COVID-19 test was a false positive.

Second, Henareh is incarcerated at USP Lompoc, part of FCC Lompoc.  It is difficult to find words to describe FCC Lompoc's tragic failure to protect its inmates during the pandemic.  The Department of Justice Office of the Inspector General ("OIG") released a report in July on the topic.  At that time, all inmates

---

[2] CDC, Certain Medical Conditions and Risk for Severe COVID-19 Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions (last accessed Jan. 8, 2021).

at one of the FCC Lompoc facilities (FCI Lompoc) had been given a
COVID test.  The number of inmates testing positive for COVID-19
<u>exceeded 75 percent</u>, and the number of staff testing positive
<u>exceeded 60 percent</u>.  Sadly, four inmates died.  The OIG faulted
FCC Lompoc for a "preexisting shortage of medical staff," a "COVID-
19 screening process [that] was not fully effective," and a lack
of sufficient personal protective equipment.[3]  The OIG also found
that throughout this time, the Bureau of Prisons ("BOP") made very
little use of its authority to release inmates to home confinement.
Finally, the OIG found that in one specific instance early in the
pandemic (March 22, 2020), FCC Lompoc neglected to test or isolate
a symptomatic inmate who later tested positive.  Notably, Henareh's
own infection followed close on the heels of this failure to act.

   The Government concedes FCC Lompoc's early failures but notes
that FCC Lompoc has taken measures to improve its response to
COVID-19.[4]  More relevantly, the very fact that Henareh had

---

[3] Department of Justice, Office of the Inspector General, Remote
Inspection of Federal Correctional Complex Lompoc ii,
https://oig.justice.gov/sites/default/files/reports/20-086.pdf
(July 2020) (last accessed Jan. 8, 2021).

[4] The Government also argues that this Court should apply
Sentencing Guidelines § 1B1.13 and the associated Application Note
and that, based on that Note, Henareh's medical condition is not
an extraordinary and compelling circumstance because he is not
suffering from a "serious medical condition . . . that
'substantially diminishes [his] ability . . . to provide self-care
within the environment of a correctional facility and from which
he . . . is not expected to recover.'" <u>United States v. Zubkov</u>,
No. 14 Cr. 773 (RA), 2020 WL 2520696, at *3 (S.D.N.Y. May 18, 2020)

COVID-19 and recovered considerably diminishes his current risk. If the once-terrible conditions at Lompoc warrant any reduction in Henareh's term, therefore, it must be on a basis other than any current health risk.

Before turning to what that basis might be, however, it should be noted that, separate and apart from COVID-19 risk, Henareh argues that a second extraordinary and compelling circumstance warrants his release: his wife and 15-year-old son need him back in Romania. Specifically, his wife suffered a stroke in 2017 and can no longer work or live independently. Henareh contends that his wife and son are now completely dependent on the generosity of friends and neighbors for basic necessities. Henareh's mother-in-law is also severely ill. The Government argues, however, that Henareh has siblings who could care for his wife and son, and they do seem to have generally muddled through since his wife suffered her stroke three years ago.[5]

---

(quoting U.S.S.G. § 1B1.13, App. n.1(A)). However, as noted above, Brooker clarified that the Application Note is not binding upon the Court and the Court may consider extraordinary and compelling circumstances other than those enumerated therein.

[5] The Government again cites the Guidelines and Application Note as if they are binding, saying that "Henareh does not claim that his son's sole caregiver was incapacitated or that he is the only available caregiver for his wife, which are the relevant inquiries under § 1B1.13, Application Note 1(C)." Opp., ECF No. 146, at 10 & n.6. Again, however, the Application Note is not binding on this Court.

In short, the specific circumstances on which Henareh relies
-- the bad conditions at Lompoc and the hardships faced by his
family in Romania -- are not sufficiently compelling to warrant
his immediate release.  As noted, Henareh has likely already
contracted and recovered from COVID-19.  While the Court does not
entirely discount the chance either that Henareh experienced a
false positive or that he could be reinfected, he has not shown
these to be more than remote possibilities.  On top of this, a
vaccine may be available at Lompoc in the relatively near future
and, perversely, the extraordinary rate of infection at Lompoc
might already have brought it close to herd immunity.  On these
facts, the Court finds that the risk of future COVID-19 infection
is not an extraordinary and compelling circumstance warranting
Henareh's immediate release.

Henareh's family needs, while also not irrelevant, do not
support immediate release.  Nor can it be said that financial
hardship to one's family -- a common result of one's committing a
crime and being imprisoned -- can of itself be called
"extraordinary."  Indeed, when someone commits a serious crime and
is caught, the felon's family members are almost always among the
primary victims of the result of his misconduct and suffer both
financially and psychologically.

But, as previously noted, the Court must consider not only
immediate release, but also sentence reduction.  And here Henareh

has a somewhat better case.  Most notably, the severity of
Henareh's sentence has been effectively increased because --
through BOP's failures at FCC Lompoc -- he was forced to confront
a risk of serious illness and death, along with the psychological
toll that that entailed.  To be sure, the vast majority of
Henareh's fellow inmates at FCC Lompoc were also infected, but due
to Henareh's age and hypertension, he faced an especially harrowing
ordeal and an especially high risk of death: as noted above,
inmates of Henareh's age are 30 times more likely to die than
inmates younger than 30, and that is before taking into
consideration Henareh's hypertension.  Several of Henareh's fellow
inmates did not survive their infections.  Fortunately, Henareh
did, but that does not detract from the serious risk he faced
because of FCC Lompoc's ineptitudes.

Along the same lines, while general financial hardship to
Henareh's family was, as noted, a foreseeable effect of his
incarceration, his wife's stroke was not particularly foreseeable
and has imposed still further hardships and strain.  And one can
only speculate as to how long the family members will continue to
support his wife and son.

Putting this all together, the Court finds that (1) the
unexpectedly harsh punishment to which Henareh has been subjected
-- both because of his age and hypertension and because of FCC
Lompoc's failure to protect its inmates from the pandemic -- and

(2) his family's likely future need for financial and other support, together constitute a sufficiently extraordinary and compelling combination of circumstances to warrant a modest reduction in Henareh's sentence.

### III. The 3553(a) Factors

Next, the Court must weigh the factors listed in 18 U.S.C. § 3553(a), the same factors the Court considers whenever imposing a sentence.

One group of relevant factors relates to the crime itself: "the nature and circumstances of the offense" and "the need for the sentence imposed . . . to reflect the seriousness of the offense [and] to promote respect for the law." 18 U.S.C. § 3553(a)(1)-(2). The Court's consideration of these factors is independent of any risk or hardship imposed by the pandemic. Henareh participated in a major drug conspiracy. He sought to profit from a scheme meant to poison American streets with heroin and to fund the terrorist activities of Hezbollah. On the other hand, as the Court recognized at sentencing, Henareh's role and involvement were not especially critical to the conspiracy; he was not a "kingpin."

The Court must also consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Here, too, little has changed. This was Henareh's first criminal conviction, and based on the evidence the Court had seen, "in every other aspect of his

life [besides this crime, Henareh] conducted himself as a good father, good family man, good citizen, good person." Sent. Tr., ECF No. 146-2, at 33-34.  Nothing has occurred during Henareh's incarceration that alters that assessment; but it was already fully taken into account in the below-guidelines sentence the Court originally imposed.[6]

More immediately relevant are certain other § 3553(a) factors such as "the kinds of sentences available," "the need for the sentence imposed . . . to provide just punishment for the offense [and] to afford adequate deterrence to criminal conduct," and "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)-(3).  Viewed through these lenses, the sentence Henareh is now serving looks materially different from the sentence the Court envisioned.

Some of those differences affect all inmates during the pandemic, such as constant lockdowns and other unusually severe

---

[6] Henareh's arguments for compassionate release are not grounded in a claim of complete rehabilitation.  Nevertheless, to show that he is not a "model inmate," the Government points to Henareh's minor infractions (e.g., refusing to obey an order, interfering with staff).  Defense counsel counters that Henareh, a non-native English speaker, struggles to comprehend guards' instructions.  On the present record, and given the plausibility of that explanation, the infractions are of negligible relevance to the § 3553(a) inquiry.

conditions of confinement necessary to reduce the risk of COVID infection in the close quarters of a prison.  Another difference, while not affecting the entire federal prison population, was sadly widespread at FCC Lompoc: the overwhelming risk of contracting COVID-19.  But most importantly, unlike most inmates at FCC Lompoc or otherwise, Henareh, because of his advanced age and hypertension, faced a heightened risk that if he contracted coronavirus, he could suffer serious illness or even death.  The Court plainly must consider the risk of serious illness or death to which Henareh was exposed when assessing the "kinds of sentences available," as well as whether a sentence reflects "just punishment" and whether the sentence provided Henareh with needed medical care, training, and other correctional treatment. Furthermore, both the increased risks faced by vulnerable individuals like Henareh and the heightened restrictions imposed upon all prisoners during the pandemic may enhance the deterrent effect of prison sentences served during the pandemic by making the conditions of confinement harsher, both physically and psychologically, than they would otherwise normally be.

Balancing these and all the relevant § 3553(a) factors, the Court finds that while releasing Henareh today would be totally inconsistent with the severity of his crimes, a modest reduction in the length of the sentence is appropriate.  In other words, if at the time of sentencing the Court had been aware of the

conditions of confinement Henareh would face, then it would have found a term of somewhat less than 210 months' imprisonment to be sufficient, but no greater than necessary, to achieve the purposes of criminal sentencing.

IV.  The Nexus Requirement

Finally, the Court asks whether there is a sentence reduction consistent with the § 3553(a) factors that is warranted by the extraordinary and compelling reasons.  A motion for sentence reduction can be granted only where there is a nexus between the two because the Court may reduce a defendant's sentence only if the "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added).

While courts rarely consider this nexus requirement explicitly, it comes into focus when a court considers granting a partial reduction in sentence, rather than immediate compassionate release.  Here, the nexus is apparent because the Court does not find that a risk of imminent illness or death constitutes extraordinary and compelling circumstances.  Rather, as noted, the Court finds that the unexpectedly harsh punishment to which Henareh has been subjected and his family's need for his support constitute extraordinary and compelling circumstances warranting a partial reduction in Henareh's sentence.

How much of a reduction these circumstances warrant is a very different inquiry, not subject to any guidelines or other

14

prescribed calculation.  Weighing all the evidence and arguments offered by both sides, the Court concludes that these extraordinary and compelling circumstances warrant a reduction of one year, *i.e.*, 12 months.  The Court also concludes that such a reduction is consistent with the § 3553(a) factors; in other words, if the Court were imposing sentence on Henareh afresh, with full foresight of these conditions, it would have found that a sentence of 198 months' imprisonment was sufficient to comply with the purposes of criminal sentencing.

For the foregoing reasons, Henareh's motion for a reduction in sentence is granted in part, and his sentence is modified to reduce the term of imprisonment from 210 months to 198 months. All other aspects of his sentence remain in full force and effect.

SO ORDERED.

Dated:    New York, NY
          January 13, 2020          _____
                                    United States District Judge